May it please the court, my name is Keith Anthony and I along with my colleague Bill Bryan represent the Appellants Cybernet, LLC and Aladdin Real Estate, LLC. I will be addressing issues related to the summary judgment motions and Mr. Bryan will be addressing issues related to the motion to compel. There are two primary issues to address with respect to the summary judgment motions. The first, whether the damage caused during the execution of the search warrants was excessive and unreasonable in violation of the plaintiff's Fourth Amendment rights. And second, whether each of the defendants can be liable for that unreasonable damage. I'll address the damage issue first. It's well established that excessive damage to property violates the Fourth Amendment and the test to determine whether or not it is What was the nature of the search? Was it a high-risk search? Did it involve an invasive search for weapons and drugs? Were there flash grenades and smoke bombs that were being used? Was there somebody there who was armed? There is no de minimis standard. There's nothing that if just a very minimal amount of damage was caused then it's per se unreasonable. You have to look at the totality of the circumstances. You look at the damage in the aggregate. How much damage was caused? You don't view each... There are cases dealing with instances in which there have been contests against damage that arise from searches. Most of them, a lot of them, damage far worse than what was here. I mean far worse than what was here. And so I don't know if you can say there's no minimum. I understand that, but I'm not saying you've minimized any of it. But, you know, damage that's incidental to a search in cases in which far greater damage was done, the courts have found that is not a basis for an action. Again, you look at it from the totality of the circumstances. And we've cited a number of cases in our... One of the problems, though, is that these kind of suits are so often brought as revenge suits in the sense that the people who are the object of the search are just furious that the search was even undertaken. And they're going to bring suit. And what they're really objecting to is the fact that the premises were searched. And as Judge Wynn points out, the damage here was really relatively minor compared to what we usually see in these circumstances and in these situations. And a lot of it's highly speculative as to what the causation is. And so I have the concern that if this establishes a Fourth Amendment excessive force case, we're going to be off to the races. All kinds of things will qualify. I don't think this is changing the law. I think this is applying the standard that's you look at the totality of the circumstances. There are certainly cases that have more damage, but there are cases that have less damage. And the cases that have more damage and the cases that are often cited to, particularly by the appellee, are cases that involve really invasive searches where they're looking for drugs, where they're going in and they're ripping apart... I mean, you sort of throw in the kitchen sink here. You've got one of the elements of damage is a window sticker was removed. Well, maybe you would prefer that the window sticker not have been removed. But that seems pretty minor, really, all things considered. And it could well be evidence of some sort. And if you isolate that by yourself, I understand... that issue by itself, I understand the point. But when you look at it in the aggregate, when you look at their 3,500 linear feet of LED lighting that goes along their roof line... Well, I'm trying to look at it in the aggregate, and then you have... you complain about damage to computer wiring and a door lock, and then there's this one undated photograph that showed no damage. And then you say, well, there was a fire here, and that the fire was caused by water. The water caused the fire, and the search in some way caused the water. But the search is very speculative because there was never any water. There was never any rain between the time of the search and the time of the fire. So I don't understand where the water would come from. There was no rain. When it did rain is when the damage arose. And so you had the search that occurred. Before the search, there was no problem with leaking. When the search occurred, afterwards, there was... when it rained, there was damage that occurred inside the building. And when they looked to figure out... Yeah, but we don't necessarily say after that because of that. There's supposed to be a Latin expression for it, but I've forgotten it. Recipso loquitur? I mean, it's... No, that's not it. It's post hoc proctor hoc. Well, Recipso may actually sort of apply when you think about it from that perspective in terms of you didn't have an issue before. You have an event that occurs, and then you have damage that occurs after that. And you investigate what caused it, and you look and you see the conduit on the roof that all these wires ran through had been dislodged. And that's how the water got in and caused the damage because there had been pulling on these wires. There had been wires that had been cut on the roof. There's all these... Well, the search warrant had ordered the searchlights removed, right? Not the LED lights. Pardon me? Not the LED lights. It authorized the seizure of the security cameras. And so the position of the police is that... But didn't the search warrant order the removal of the search cameras? The security cameras, yes. I mean, the security cameras. Yes, that's correct. But there was separate LED lighting that ran along the roof line. Again, 3,500 linear feet. Not just a small amount. 3,500 linear feet. And all of that was ripped off the entire track. Let's suppose, just assuming arguendo, that there was some negligence with respect to the removal of the security cameras. Hasn't the Supreme Court been pretty clear as a general matter that negligence is insufficient where mere property damage is involved, that negligence is not sufficient for recovery of damage to property? That's correct. And in contrast, intentional and malicious damage is not. And I think here when you look at the facts objectively and see what happened, that this appears to be intentional and malicious. The evidence taken in the light most favorable to the appellants is that there was absolutely no reason to remove any of this LED lighting. The lighting and the cameras were all tangled up in one another, weren't they? That's the testimony of Deputy Deaver. That's disputed by the appellants. They say that's not the case. They were not tangled up. There was absolutely no reason to remove the LED lighting. But that was gratuitous. It was done as part of a pattern to perhaps send a message to them. And there's a lot more history there, which we've alleged, related to the relationship with the sheriff, which is consistent with all of that. But there was no reason to do that. The security cameras, those wires weren't tangled. They easily could have been removed. All they had to do was be unplugged. There was a 12-inch cord that came out of the security cameras. All they had to do was unplug them. And so the testimony viewed in light most favorable of the appellants is that there absolutely was no reason at all to be yanking on these wires, to be cutting these wires, to be removing the LED lights. And that's the standard that has to be applied here. Why wouldn't you think that security cameras required wiring in order to work? They do. The test, the evidence in the record, again, in light most favorable to the appellants is that they were not tangled. And that they were 15 feet or so apart, the way that they ran. One went into one conduit. One went into another conduit. And that they were not tangled. Let me ask a question about the cameras. These cameras, you say it's only a 12-inch, I'm going to call it a cord, only a 12-inch long cord that connected the computer to its source of electricity? Correct. There was a plug that ran from the security camera that came out 12 inches and then got plugged into another wire. It was a plug. And so you could unplug it. That's what I'm saying. It's only 12 inches. Correct. So a 12-inch cord, you just unplug it. Yes. And there's a picture of that in the record. Right. So if it was tangled, I mean, it's only 12 inches, you pull it out. But, you know, we're talking about a large roof line, large roof. And so you have security cameras in different spots. And they all have those 12-inch cords. Most of them were seized. There were a few that were not. The picture of one that was not seized. But those wires were separate and completely different from the other wires. Each one was connected with its own source. So you just go around the roof line and go unplug, unplug, unplug, unplug, right? Correct. Absolutely. And so in our view, you do have damage that is excessive and is intentional when you look at it objectively. And under the reasonableness test of the Fourth Amendment, that is sufficient to arise to a constitutional violation. And then the evidence also shows that each of these defendants are liable for it. We saw Deputy Deaver up on the roof. He's the one person that we could actually see. He was positively identified. And because of that, they've admitted that he was up on the roof. They've just said, well, it was tangled. They've come up with excuses, which we don't believe for purposes of summary judgment. We look at the other objective facts. And so we know he caused that damage. We know that he may have caused the damage that was inside. You can make an inference. There's a Fourth Circuit case that deals with this, that when there is similar damage that occurs somewhere else, you can infer that that same person caused that damage elsewhere. And then there's law about if you are not simply a bystander but an active participant, that you are liable for the damage that is caused during the execution of the search warrant. I see my time has expired, so I will continue the rest for rebuttal. Thank you. Mr. Bryan. May it please the Court. My name is Bill Bryan. I am with Mr. Anthony, my partner, and we are here on behalf of the appellants. I'm here to talk about the motion to compel and the order that was entered on that motion to compel. We believe this is an abusive discretion standard, and we understand that that is a high standard to overcome. However, we believe in this case that the law and the facts do overcome that standard. Number one, because we were prevented from doing two things in these depositions by the objections of the counsel. One was we were prevented from inquiring into the direct actions that were taken by the District Attorney with regard to the raid and the instructions that he gave to his people and to the Sheriff's Department about how the raid should be conducted, number one. And number two, we were also prevented from looking into the question of malice and whether the DA in particular in the question as to whether the DA had policies in place and whether those policies were deviated from in connection with the way the raids were handled and the way that the press conferences were handled afterwards. With regard to his direct – What did you expect to find, some written documentation that they – Well, I was asking – it isn't a question of written documentation. We requested documents. We didn't get documents. What I wanted to do, what we wanted to do in the depositions was ask questions and ask, for example, what is the – let's just take the press conference as an example. The press conference was held before the raid had ended. No evidence had been examined. The charges that were filed that day were filed on the basis of no examination of the evidence. The assistant district attorney testified that he had no idea what kind of software was being run in this facility and how the game worked. Even later on, when he added 20 charges, he said he'd never – he admitted that he'd never actually looked at the software. He didn't know what the log-in screen looked like or anything like that. The argument you're making with regard to the motion to compel, if we were to hold against you in terms of the summer judgment, would it be there? Does that – No, because we weren't able to explore. It depends on how you hold on the summer judgment. But, I mean, would we reach your argument? Yeah, you would. You would. You'd have to – Even if we found against you that summer judgment was properly granted against all of these? Yes, because – We still would have to address the motion. Like I said, it depends on how you find that summer judgment was properly granted. Because if you determine that it doesn't matter what we were – in the terms of the deposition, then you could grant summer judgment and you wouldn't have to reach this point. Let me ask you. I know you're here on the motion to compel, but on the summer judgment, there's a certain list of things in which it's agreed. Part is that there was damage. Then Mr. Smith made additional statements that seem to be the basis of your big complaint about the damage. He was not there doing the search. So I guess my question is, to what extent does his testimony – does it, in your view, form a question of fact, a disputed fact, his testimony alone? I'm sorry, Mr. Smith's testimony? Yes, alone. If his testimony alone is the damage that's alleged here, assume that, would that be sufficient to overcome summer judgment? If your question is, in this case, I would say that it is because I don't agree with your characterization of his testimony, that he did have direct – if he didn't have any direct knowledge of the facts and he was testifying entirely in a manner which otherwise would be inadmissible. My question is, is his testimony here what you rely on to create the issue of fact? He didn't submit any documentary evidence. I mean, he didn't submit any photographs. All that stuff is available. None of that came out in the trial. What you primarily seem to rely upon is his statements. Well, it's because we weren't able to complete the discovery that I'm up here talking about. I got that point. My point is, is that his statements? Must they be taken in a light figure so as to create an issue of fact alone? I think we have his statements plus the physical evidence that were obtained, plus the statements of other people who were involved in the matter, including the ADAs, to the extent that they did testify, and also the sheriff's deputies who also testified in this matter. But the physical evidence doesn't help us in terms of the tangling of the wires. It doesn't seem to help us in terms of the water in the fire. Well, the – It's really his testimony on those things that – No, there was a third party who examined the fire and determined that the way – it wasn't so much that the water got it. It was the way that the wires had been pulled up that caused a short, which then caused the fire. There was also water damage that happened separately from the way the wires pulled up. And it's important to understand, we're talking about decorative lighting here. This is not lighting that was connected to the security system in any way. This was just 3,500 square feet, linear feet of Christmas lights, for lack of a better way to put it, that were around the top of the building. So, yeah, there was third party evidence with regard to the fire. There was third party evidence with regard to who was present. There was third party evidence with regard to the damage that was done and whether it was necessary or whether it was gratuitous. The window – somebody made a comment about the window sticker. It wasn't – it was a large mural, and it was just torn down and left there. And there was no explanation given for that. I call that physical evidence of a gratuitous act. And so under those circumstances, yes, Your Honor, we would take the position that there's more than adequate evidence to create an issue of fact for summary judgment, especially if we're permitted to continue to look into these questions about what the policies of the DA's office were and whether they were followed in this case, and if they were not followed, why they weren't followed, and also the instructions that were received by the ADAs with regard to Mr. David in particular, that were received by the ADAs and why they were there in the first place. They both testify that they never go on raids, and yet for some reason we had two ADAs. Two ADAs, a helicopter. We had some 50 officers on site. We had an entire list of people who had signed in to be there that day. And so these – we had – I believe we have a good faith basis in the law and in the record to make these inquiries in the – to continue with these depositions. And it's not – the court below said it would be burdensome. We're just talking about a couple hours for the deposition. We didn't ask for 10 million pages of documents or anything like that. We just want to know what the answers are. And that burdensome issue was never raised by the defendants in this case. It was something the court came up with after it had already granted some of the – I can see my time is well done as well. Thank you. Thank you, counsel. Mr. Small. May it please the court. My name is Patrick Small, and I represent Sheriff McVicker and Deputy Deaver. The Fourth Amendment does not micromanage how law enforcement officers execute search warrants, nor does it require that they use the least intrusive means when doing so. Here, in searching plaintiffs' illegal gambling business, the Blading County Sheriff's Office seized 113 computer monitors, 88 CPUs, 64 keyboards, and 20 standalone illegal kiosks for sweepstakes use, none of which were damaged. As for the damage that is alleged incident to the search, it was reasonable under the totality of the circumstances, and therefore the court should affirm summary judgment for three reasons. First, there is no Fourth Amendment violation. Second, Deputy Deaver and Sheriff McVicker are entitled to qualified immunity because they did not personally violate the Fourth Amendment, and in addition, no clearly established law prohibited their conduct. Finally, the plaintiffs have failed to identify an official act that violated the Fourth Amendment. To begin with, when you look at the damage that is alleged, with respect to the window sticker, the search warrant said, sweepstakes items, items that are used that are fruits and instrumentalities of the crime. The window sticker at issue said, enter and win, cash prizes, our sweepstakes games, and depicted a Las Vegas skyline. They were authorized to take that down, and it's an adhesive of nature, so when you take it down, it's necessarily going to be damaged. Did you put it in the trash can? Yes, Your Honor, that did happen, and that should not have happened. Didn't take it away with you if it was so important by evidence. I agree, Your Honor, but one of the keys here, too, is that they're proceeding under a collective liability theory, which is not applicable under Section 1983. They have to establish personal causation. There's no evidence that Sheriff McVicker or Deputy Deaver had anything to do whatsoever with the window sticker. Next, they also seem to suggest that the defendants completely denied having any involvement whatsoever, and that's frankly not true. As we mentioned, Deputy Deaver admitted in his answer that he was on top of the roof, that he removed the security cameras, and that he also removed the LED lighting. Now, what's critical here... Why did he remove the lighting? That's almost 12 football fields long. Your Honor, I think that it's a great question that you raise, and one that's important to look at Jeff Smith's testimony. When Deputy Deaver arrives there, he says that he sees a big gum of wires, a lot of wires, like a bird's nest in a fishing reel, and therefore he thought that it was necessary to remove the LED lighting in order to remove the security camera lighting. But I think what's critical is to look at what is the damage that's being alleged with respect to the LED lighting. During Mr. Smith's deposition testimony, when asked if the LED lighting itself was damaged, and this is two and a half years after the search, he said, I don't know. I haven't plugged it into the power source, which was allegedly damaged during the fire. If I plugged it in, I guess I would find out. So there's no evidence the LED lighting itself wouldn't even work once it was simply plugged in. You have to be reinstalled. Yes, and you do that by hand, and I think that's a good point that you raise, because in the record they admit in their request for admission that it can be removed and reinstalled without issue. And this is a really good example of the least intrusive means standard. Without issue? You think you can get somebody to put 12 football fields long of lights free by hand in your house if your home was that big? I certainly do, Your Honor. You think so? Free? It would cost something. It's called labor. Sure, it would take labor, Your Honor. But I think the key is that this is a plastic track, and you simply place it in or you take it out. And what they say is that he shouldn't have just pulled it by hand. He should have used a hand tool. With respect to the security camera, they say he should have used a screwdriver rather than pulling it out. That's the trivialization of the Fourth Amendment that's taking place here, and specifically the Seventh Circuit and Johnson v. Manitowic said that you don't have to use the least destructive means available. Here's the funny context. You knew about this place, you meaning your client, about this place for a long time, correct? I believe three months was the course of the investigation. And you sent someone in to look at the place? The interior, but not the roof. The roof was only accessed by one individual, and that was Deputy Deaton. But you had an idea of what it looked like, right? That's correct. And you planned the raid, or I should say the execution of the search warrant, right? That's right. You would have to know then what was the exigency, what was such a hurry? You had enough. How many officers did you have there? I believe that there were 22 individuals and 16 of which were from the Bladen County Sheriff's Office. What was the helicopter for? Was there a helicopter? There was a helicopter. It was there briefly. What was the helicopter for? Well, it really has nothing to do with the destruction that's alleged, Your Honor. That means you're not going to answer my question. The helicopter was there because there was a missing person search taking place in a nearby county. The sheriff was coming by to the search team because he was called. This was only involving him by the way the day of the search. He's called. He has to deliver a U-Haul truck. He was currently at an elementary school when he is called giving a presentation about the Bladen County Sheriff helicopter. So he says he gets this call that he needs to take the U-Haul truck. He gets a call that there's a missing person, and he says, I can't go today. We have somebody from Cumberland County that can ride with you. Meet us halfway, which is in Dublin. So he arrives, helicopter arrives, and then takes off with the other guy from Cumberland County. So the helicopter was totally just coincidental to being there. That's correct, Your Honor. The helicopter was there briefly. It had nothing to do with the search. It did take four aerial photos because it was on the way, and he said, might as well take some photos while you're up there. But they're alleged that this was malicious. Correct. Your Honor, to rely on the malicious standard, they cite to Cody V. Mello, which is a Second Circuit case revolving around the vacation of a default judgment, in which they say, no, these officers should be allowed to proceed on their qualified immediate defense to determine whether or not their conduct was intentional and malicious. That's not the standard in the Fourth Circuit, nor is it the standard of the Supreme Court in Harlow, which completely eliminated any subjective intent whatsoever. In this court in Brown v. Elliott, reiterated again, subjective intent plays no role whatsoever. We have to look at the objective reasonableness. I agree with that. It's obviously an objectively reasonable standard. Even if you were to go to a subjective intent, there's an awful lot of stuff here that was left totally untouched. That's correct, Your Honor. If the officers were on some sort of rampage, they would have torn the place up. But as I understand it, there were just a great deal of the equipment and everything else was left untouched. Yes, I went through the itemized list of very valuable computer equipment, none of which was damaged. What they allege, again, are wires. What they rely on is the self-serving testimony of Jeff Smith, who wasn't present during the searches, and they provide no documentary evidence. What's critical there is that, yes, testimony can at times be material, but the court has to consider competing inferences to the contrary or the eight depositions of officers not even related to the defendants themselves who said they saw no damage whatsoever. But again, Jeff Smith arrived on the premises, according to his testimony, moments after the search was conducted. And he said that he documented all of the damage that took place, took photos. Where are their photos? There are none. In the cases at the plaintiff's site, you have before and after photographs, you have testimony, and the court still says that it's a close call in a lot of the cases that they cite. In some of those, there's no potential of a reasonable mistake or negligence. And that's all that, if you take the evidence in the light most favorable to the plaintiff's and you credit Jeff Smith's testimony, Deputy DeVere's actions on top of the roof were negligent at best. Were the computers seized? Yes. They were seized? Yes. And the 113 things you talked about, there was no damage, you seized those? 113 computer monitors, 88 CPUs. Weren't those things perhaps subject to forfeiture if they, in fact, were found guilty? Well, Your Honor, there's a plea agreement that had. I'm not sure about the forfeiture circumstance. Isn't it potentially, if you seize something, these computers, isn't it potentially subject to forfeiture? Yes, potentially, Your Honor. Well, then you wouldn't want to damage something that you're going to take that might be valuable to forfeiture, would you? I'm just talking just hypothetically. I'm just using your example. You say, well, it couldn't have been balanced because they didn't damage these things. You seized those, right? So I'm just talking a little logic here, hypothetically. Well, if you're going to seize it, why would you destroy something that potentially might be forfeited? The question is what's left in it that you look for damage, not what you took away. That wouldn't mean anything. Oh, well, it couldn't have been that because we didn't damage anything that we took away. And all that's left, they refer to, are, again, the window sticker. We've addressed a broken wooden table. You said sticker. I think they said mural. They refer to it as a mural. We refer to it as a sticker. It's an adhesive. It's not a painting. Well, what's this junction? You put your hand up like that. That's important for us in terms of differences, right? I apologize, Your Honor. You can treat it as a window mural if you see fit. However, it's important to note that murals… I'm treating it as what the plaintiffs did. That's what the rules offer. Emphasis drawn in the non-moving party. I didn't make this up. This is the law, isn't it? Yes, but with respect to murals, I think there is a distinction about the use of the term. I think that's typically used with respect to a painting. This is not a painting. This is an adhesive fixture that was applied to a window that is the equivalent of a sticker. If they refer to it as a mural, that's fine. But distinction without a difference ultimately… It refers to the root word. It says wall, mural, glass wall, concrete wall. There's all kinds of media of art you use, but I think the idea of the mural comes from the root word wall. But go ahead. The other evidence that was alleged left behind and damaged is merely wires. Again, there's specific case law here saying, and this is in the Ninth Circuit, Pacific Marine v. Silva, that when you are going to a business and you are searching for electronic equipment and you tear wires, you rip wires, you cut wires, that's relatively minor destruction of property that is acceptable under the Fourth Amendment, and it's clearly established law that that's relatively minor. Unless it's deemed to be malicious, perhaps. Well, Your Honor, there is no evidence of malice on behalf of Deputy Deaver, who's the only individual here, identified with respect to the roof. Jeff Smith himself said… All you have to do is just unplug each one with a 12-inch cord. That's not evidence? Well, the only picture to support that is an undated picture taken out of context. Do you need a photograph for it to be evidence? I think that it's… Do you need a photograph for it to be evidence? Not necessarily, Your Honor. The answer is no. It doesn't. That's good to have it, but it's not required. Yes. And here, though, the testimony is that for this one picture, and it's this one security camera, that this was the same. And when they confronted Deputy Deaver with it, he said, yes, I would have unplugged it if it looked like that, but I don't recognize that photograph. That occurred during his deposition testimony. When you've looked over in preparing for this case, you and your fellow counsel have looked over the full range of cases dealing with execution of search warrants. I've been on several of them and have read others, and it just seems to me in the spectrum of things, in the range of things, that what happened here was just, by comparison to so many other cases, really relatively minor. And the things where the officers were brought up short was where there was some objective evidence of just coming in and tearing up a person's property from beginning to end, uprooting things and damaging things unnecessarily and leaving the whole premises a total wreck and a mess. And, you know, we don't have that here. I mean, not only is there no least intrusive means standard, but the Supreme Court's been perfectly clear that negligence, if there was negligence here, is not sufficient to establish unconstitutional property damage. Yes, Your Honor. So it just seems to me in light of the legal landscape and in light of the different factual circumstances in these cases across the country that this one is relatively minor. I mean, they had a job to do. They had a search warrant. The search warrant listed things that had to be secured and seized. I mean, they had to do something. Yes, Your Honor, and the search warrant here involves two large illegal gambling establishments in the middle of a small town crossing each other. This is really expansive search. I list it off. They literally seized hundreds of computer equipment in the process. The reason they had so many people there, the search still took over six hours over the course of the day, even with all those individuals there, because they were being careful with that valuable property that you mentioned. And I think it is important to note that it's not just that the damage is minor, but the cases that they cite for excessive force, there was no possibility of a reasonable mistake, like Deaver on top of a roof who's confronted with a variety of wires and may accidentally pull on the wrong one. In those cases, they have an individual searching for a machine gun who then submerges a different gun in a water bowl and leaves it. That's Lawmaster. In another case, they had a speaker box that's soaked. That's Rodriguez. That has nothing to do with finding drugs. Why would you soak a water box? They also have another case where you're searching for a person, and in the course of that search for a person, you stomped on a video game console, and you stomped on a video game controller. You can't possibly be confused that that's not a person, or that the person will be hiding inside a video game controller. So here, what you have at best is a reasonable mistake. There's negligence, and under 1983, you cannot be liable for that. In addition, I'd like to add that Sherrick McVicker, they concede that he did not personally destroy any property. They've identified no instruction by him to destroy any property. There's no evidence to support that that ever happened, and they're not proceeding on a supervisory liability claim. I see that my time has expired. If there are no further questions, we respectfully request that you affirm summary judgment. Thank you, Counsel. Mr. Doggett. May it please the Court. My name is Jim Doggett, and I represent District Attorney Jonathan David. My colleague, Mr. Spaz, just argued that summary judgment should be affirmed for the sheriff to defend himself, because there was no violation of the Fourth Amendment and no violation of clearly established law. If you agree with Mr. Spaz, summary judgment should also be affirmed for Mr. David. However, there are separate, independent grounds to also affirm summary judgment for Mr. David. First, the district court correctly held that there was no real dispute that Mr. David was responsible for the execution of the search warrant at all. And second of all, the district court also did not abuse its discretion when it denied the motion to impel further discovery on the extent of Mr. David's participation. I'll address the motion to impel first, because my colleagues mainly relied on that with respect to Mr. David. They're exactly correct that it's an abuse of discretion standard. District courts have broad discovery in terms of how to manage discovery and its scope, and they only abuse that discretion when they prevent a party from exploring a litigation theory. And here, my friends were not prevented below from exploring their theory that Mr. David entered into a conspiracy with the sheriff's office to destroy property. There's no dispute that the search warrant was carried out by members of the sheriff's office, and there were six depositions of members of the sheriff's office. During those depositions, there was not any testimony at all that Mr. David was responsible for the way the search warrants were executed. Furthermore, there was... Were his employees there? I'm sorry? Were some of his employees there? Two ADAs were present as observers and also an investigator who was employed by the district court. So that's the connection to his presence, correct? Yes. It has a connection to his presence if I'm the employer and my employees are there? Yes, that's a connection, but that isn't... And the question was, during a deposition, what was told to you by Mr. David in terms of how this would be done, how it would be executed, the details? Was it not? That was the question, and counsel directed the opponent not to answer. That's correct. Why wouldn't that be relevant if, in other words, because the allegation is that he instigated. I think that's the word. It was part of the instigation of it. So you have your agents there. The theory is that you instigated. They never said he was there. The question is, what did you tell these agents who were there? How is that not relevant to the question of malice and animus and instigation? Well, malice, first of all, I think malice is simply, it's based on conjecture and speculation. It's based on what? I'm sorry, conjecture and speculation. No, no, no, no. I'm saying, no, the theory, we're not talking about the evidence that supports it. We're talking about the theory of malice. It has to be proven. You're right. Right? Correct? Correct. You have to prove it. If you make the allegation, that's your theory. You have to prove malice. Correct? Correct. All right, isn't part of it the fact that you're asking the person who was a direct party, who was there, who worked for that person, what did they tell you in terms of your observation and your participation for being there? Why is that directly not relevant? I mean, I don't know. When I practiced law, I would have marked the deposition right there. I mean, see, that's what we used to do, mark it right there and you call the judge. And let's get this, but I'm not saying this, I mean, I'm a dinosaur. That's how we used to do it. But how is that not relevant? Well, Mr. Real and Ms. Emory, I'm sorry, Ms. Real and Mr. Emory gave other testimonies as well, too, that they didn't really play any role in the searches. But they didn't answer his question. That's what counsel, I mean, that's the whole point of the adversarial system. No, answer my question as counsel, not what you told someone else. That's the whole point of depositions. Correct. But I think what happened here was you had a district court judge who was reviewing discovery in this case, who saw the overall discovery that had taken place, that there had been six depositions of members of the sheriff's office who reviewed the transcripts of the depositions with Ms. Real and Mr. Emory and saw that further questioning was just simply not really movable forward. But we can't examine the question of abuse of discretion on mocks. We have to look at what the questions were, and we know what the questions probably were because that's a matter of record. And the question becomes, was that relevant, and is it abuse of discretion not to allow counsel to ask that question of somebody who worked for the person, they were present. I mean, the whole context of it, they alleged that someone, not your client, that said take every effing thing, right? Correct. Doesn't seem very professional if that's at least we have to take that that's what he said at this point, correct? What the sheriff said, correct? Correct. What he said. I mean, I know the sheriff disputes that, but at this point we have to say he said that. That's a context. What about is it maybe I'm being misinformed, but was there some question about your client was trying a case or doing the benarment? The benarment was? Well, he had been involved in a prior prosecution, and he would also certainly bring the prosecution that was based on this search. And I may be wrong about the record, but was it that he referred to one of the plaintiffs in terms of owners and said, do you know this person? Is that right? Am I getting that right? There's an allegation that a year later that he pointed him in court. That's correct. A year later. Did the magistrate judge here rule that the depositions would have been cumulative? That's correct. And duplicative? Tell me what the basis of that ruling was. Well, the basis was that Ms. Real and Mr. Emory gave extensive testimony about what happened during the searches. Mr. Emory testified that he arrived while the search was going on, that he did not see the destruction of any property, and that he did not give any advice about how the search warrant should be executed. It may have been relevant in some sense, but the basis of the ruling was cumulativeness and duplicativeness, was it not? Absolutely correct. That's right. The other point I would want to make is if there's no underlying Fourth Amendment infraction and no excessive force in the execution of the search warrant, then on that account, the claims against both McVicker and David would go away. Am I correct in that? That's correct. So the whole thing really hinges on whether there was an unreasonable Fourth Amendment search to begin with, because you don't even get to the DA and the sheriff and the question of municipal policies and supervisory liability and all the rest unless you find that there was something done wrong. Absolutely correct. That's exactly right. But we would also submit that separate from that, there was just no abuse of discretion. As for Mrs. Reel, she testified as well that she arrived at the searches when they were mostly complete, the rooms were empty, that she didn't see the destruction of any property, and that she didn't remember what she had said to anyone else who was actually carrying out the search warrants. So again, I think what happened was the district court judge simply said, to what end would these depositions serve? We can see clearly from the deposition testimony that Mr. Emory and Mrs. Reel provided that it simply wouldn't provide, it's simply not worth the candle to require these people to come back in, because the evidence was really, there's a mountain of evidence that Mr. David had nothing to do with this search. There were five signed affidavits from members of the sheriff's office who said that he had nothing to do with it, that he had directed no one, no sheriff's deputies about how the search should be conducted. There were six depositions of members of the sheriff's department. These are the people who were carrying out the search. None of, they could have asked any question they wanted to the sheriff's deputies. Did Mr. David ask you to destroy property? Did he conspire with you to tell you that he had a vendetta? They didn't ask any questions like that at all. They asked all of them if Mr. David was there, and everyone said that he was not present. And so they really had enormous opportunity, hours of time that they could have asked questions about Mr. David directing the sheriff's deputies, who were the ones who actually carried out the search to destroy property. And nothing came out of that. Nothing came out of that. And the deposition testimony that did come out of Emory and Reel, the two ADAs who were present, again revealed that Mr. David had no responsibility for the search. He's a separately, he's a separately elected officer who has no responsibility over the sheriff's office, who certainly works with them. And at this point, it was simply the district court judge in his discretion decided that further discovery on this matter would simply serve no purpose. And so for that basis, we respectfully request that you affirm the denial of the motion to compel, and also affirm summary judgment for Mr. David. Thank you very much. Thank you, counsel. Mr. Anthony, you have some time reserved. Yes, thank you. A couple of quick points. One is you heard opposing counsel say, well, there are a number of cases that do admit when there's sort of limited damage, damage to a gun, damage to ceramic bowls, things like that. These are all cases that we cited in our brief. His response to that is that, well, it was clear that it was improper to damage those items there. But the significance of that and what these cases stand for is that a minor amount of damage still can be a violation of the Fourth Amendment. There are cases that we cited, one out of the Sixth Circuit where there was a total of three. I think the point that your opposing counsel was citing those cases for was that the damage to those items, it didn't necessarily hinge on whether it was minor or major, but it hinged on whether the damage was simply a gratuitous act and an act that was unrelated to the terms of the search warrant and, indeed, unrelated to the criminal activity which the search was supposed to gather evidence. So it's this kind of gratuitousness and unrelatedness, I think, more than the amount that might be objectively unreasonable. And I'm not really seeing a lot of that here. But you're right. It's a reasonableness test. And so if it's clearly unrelated, then that's unreasonable. It didn't matter if the value of it was a couple hundred dollars or $3,000. It's whether or not it's unreasonable. And here, when the evidence viewed in light most favorable to the plaintiffs, is that it was unreasonable. It was gratuitous. That's what we alleged, that this was a gratuitous, intentional conduct. And if you look at it objectively, if there was absolutely no reason to. I don't think so, because sometimes search warrants aren't necessarily broad in their terms. If you look at the seizure provisions of search warrants, particularly in business-type crimes, there are a whole lot of different items of evidence that could be relevant. But the fact that the warrants can be broad in their terms of what items can be pursuant to the terms of the warrant is thereby unreasonable. We're not complaining about the scope of the search here. We're complaining about the manner in which it was conducted. And there are certain situations where there was no need to cause any damage. And that's the thrust of that case, or of that point. The other point is, I heard argument that, you know, there was all of these computers that were collected, and none of them were damaged. Yes, a bunch of computers and equipment were collected, but there's nothing in the record about those were not damaged. Those have been seized. We haven't seen those. I don't know if they've been damaged or not. What I know is what we have seen, which is the physical premises that was left behind. We're able to go in there, and we know the condition of it before, and we see what happened. We see all the lights that have been removed. We see the cords that have been cut, lots of cords, lots of wires, and lots of different wires to TVs, to computers, a water hose to an ice machine, the electromagnet locks, the wires for that were cut. None of that was necessary, but all of those things were cut. And when you view that in objective standard, that was unreasonable. So the wires to the computers, they were seized or cut? Right. The wires were not seized. They were left behind. If you look at them, they were cut. Is there indication that you could just unplug them? Yes. And that's what Mr. Smith testified to with all of his speculatives. It was easy to. Now, they cite to Pacific Marine case. And in Pacific Marine, they said the pulling of wires and that damage was not unreasonable under the circumstances. But there was no evidence in there that there was an easy alternative that they could simply be unplugged. And that was the only damage in that case. There wasn't other damage, other wires cut, other things that had been ripped off like there is here in this case. I see my time has expired, and so if there are any other questions, I'm happy to answer those. Otherwise, we respectfully request the court to reverse the district court's judgment. Thank you. Thank you, counsel. We'll ask the clerk to adjourn the court. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Roger L. Gregory, J. Harvie Wilkinson III, James A. Wynn Jr.